Patrick T. Holscher
SCHWARTZ, BON, WALKER & STUDER, LLC
141 S. Center, Suite 500
Casper, WY 82604
(307) 235-6681 Telephone
(307) 234-5099 Facsimile
pat@schwartzbon.com

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2016 JUN -6 PM 4: 29

STEPHAN HARRIS, CLERK
CASPER

Attorneys for Plaintiff,
The Travelers Indemnity Company

## UNITED STATES DISTRICT COURT

## DISTRICT OF WYOMING

| | |
|---|---|
| The Travelers Indemnity Company, | Case No.: 16-cv-148-R |
| Plaintiff, | |
| v. | **PLAINTIFF'S COMPLAINT FOR DECLARATORY JUDGMENT** |
| Zakco Commercial Consultants, Inc., Robert Huffsmith, and Robert W. Akers, | **[JURY DEMAND REQUESTED]** |
| Defendants. | |

Plaintiff, The Travelers Indemnity Company ("Travelers"), pleads and alleges Travelers' causes of action against the Defendants as follows:

### PARTIES

1.     ZakCo Commercial Consultants, Inc. ("ZakCo") is believed to be a delinquent Colorado Corporation that at least previously had an address of 902 Redwood Dr., Loveland, Colorado 80537. Robert Huffsmith is believed to be or to have been the owner and / or President of ZakCo. Robert Akers alleges that ZakCo and Huffsmith were responsible for construction defects in a hotel that he allegedly had them build for him in Wyoming.

2.     Robert Huffsmith ("Huffsmith") is an individual believed to be residing in and a citizen of Colorado.

1

3.      Robert Akers ("Akers") is an individual believed to be residing in and a citizen of South Dakota. Mr. Akers is the plaintiff in two underlying lawsuits that he brought against ZakCo, one of which also named Huffsmith as a defendant, copies of which are attached hereto as Exhibits 1 and 2 (collectively the "Underlying Litigation"). The Underlying Litigation related to a hotel that Akers had built in Wyoming. Akers filed in Wyoming one of the lawsuits that constitute the Underlying Litigation.

4.      On September 23, 2014, Akers's attorney tendered the Underlying Litigation to the insurance agent of ZakCo and Huffsmith.

5.      On September 30, 2014, ZakCo / Huffsmith's insurance agent tendered the Underlying Litigation to Travelers. Neither ZakCo nor Huffsmith had previously tendered to Travelers the Underlying Litigation or the property damage or occurrence allegedly at issue in the Underlying Litigation.

6.      The Travelers Indemnity Company ("Travelers") is a Connecticut corporation having its principle place of business in Hartford, Connecticut. Travelers issued two potentially relevant insurance policies for the policy years October 8, 2007 to October 8, 2009 ("the Policies"). The Policies are attached hereto as Exhibits 3 and 4. Travelers has no record of having insured ZakCo or Huffsmith under any other insurance policy or bond in any other year.

## JURISDICTION AND VENUE

7.      The plaintiff and the defendants are citizens of different states. The amount in controversy exceeds $75,000. Diversity jurisdiction is, therefore, appropriate under 28 U.S.C. §1332.

8.      Jurisdiction exists in this Court over Akers because Akers contracted to have the hotel at issue in the Underlying Litigation built in Casper, Wyoming.

9.      Jurisdiction exists over ZakCo and Huffsmith in this Court because ZakCo and Huffsmith allegedly entered into a contract with Akers to build the hotel in Wyoming. Also, Huffsmith allegedly helped build the Wyoming hotel.

10.     Venue is appropriate in this Court under 28 U.S.C. §1391 because a substantial part of the events or alleged omissions giving rise to the claim occurred in Wyoming, or a substantial part of the property that is the subject of this action is situated in Wyoming as follows: The hotel at issue was built in Wyoming at the instruction of Akers; that hotel still exists in Wyoming; the hotel was allegedly built by ZakCo and Huffsmith in Wyoming; Akers sold or transferred the hotel in Wyoming to a buyer; the alleged construction defects allegedly resulted in property damage in Wyoming, allegedly harming the financial interests of Casper Lodging in Wyoming; repairs were allegedly undertaken by the buyer of the Wyoming hotel, who obtained a judgment against Akers; Akers filed a lawsuit against ZakCo and Huffsmith in Wyoming and, as to ZakCo only, in South Dakota to recover the cost of that judgment, each of which lawsuits are still pending; and Travelers has agreed to and is defending the Underlying Litigation under reservation, including with respect to the lawsuit in Wyoming.

## STATEMENT OF FACTS

### A.      The Construction Contract and Dispute.

11.     In the Underlying Litigation, it is pled that Akers had caused to be built a Holiday Inn Express Motel in Casper, Wyoming, on real property allegedly owned by Mr. Akers, identified in the Improvement Purchase Agreement as being, "LOT 1 HOSPITALITY CENTER, ADDITION, INCLUDING REPLAT OF POST ROAD A PORTION OF THE LEGION ADDITION TO THE CITY OF CASPER, NATRONA COUNTY, WYOMING" (hereafter the "Wyoming Property"), which hotel was allegedly to have certain characteristics (hereafter

referred to as the "Hotel"). It is alleged that Akers caused the hotel to be built in order to sell the hotel to James Koehler or his assignee, Casper Lodging. It is also alleged that, due to alleged defects in the construction, Akers was sued by Casper Lodging in a lawsuit in South Dakota styled *Casper Lodging, LLC v. Robert W. Akers*, No. 09-1731 (South Dakota 7th Circuit) (the "*Casper* Litigation").

12.     The *Casper* Litigation alleges that Mr. Akers agreed to construct the Hotel upon the Wyoming Property in compliance with certain plans and specifications pursuant to the Improvement Purchase Agreement; the 1997 Uniform Building Code; the standards and specifications of the Holiday Inn Express system; or in a manner acceptable to the *Casper* plaintiff or that plaintiff's assignee. The *Casper* Litigation complaint further alleged that Mr. Akers breached the Improvement Purchase Agreement by failing to construct the Hotel in compliance with its terms.

13.     Akers alleges in the Underlying Litigation (Underlying Complaints) that ZakCo entered into a contract with Akers in which he agreed to cause the Hotel to be built, which was allegedly to have certain characteristics. Travelers alleges, based on information and belief, that ZakCo entered into the contract to cause the Hotel to be built in or about 2003 to 2004.

14.     Travelers alleges, based on information and belief, that ZakCo hired certain subcontractors to build the Hotel and that ZakCo did not itself build any part of the Hotel.

15.     The Underlying Complaints allege that Huffsmith was involved in building the Hotel. However, Huffsmith has indicated that he was not involved in building the Hotel, but had rather hired subcontractors to perform the work.

16.     Travelers alleges, based on information and belief, that construction of the Hotel was completed in early 2004.

17.     The Underlying Complaints allege that Casper Lodging became the owner of the Hotel in February 2004. Travelers alleges, based on information and belief, that the Hotel was delivered to Akers and then to James Koehler or his assignee, Casper Lodging, in 2004.

18.     Travelers alleges, based on information and belief, that from as early as March 2004 through October 2009, Koehler and/or Casper Lodging complained to Akers about alleged defects in the construction of the Hotel, including construction defects that resulted in water damage and missing sound insulation, and demanded that the construction defects be corrected. Travelers alleges based on information and belief that Akers deflected Koehler's / Casper Lodging's complaints by referring the matter to ZakCo, as the alleged general contractor.

19.     Travelers alleges, based on information or belief, that Koehler's and/or Casper Lodging's complaints about the Hotel were made known to ZakCo and Huffsmith from time to time between 2004 and 2009.

20.     Travelers alleges that, on or about April 30, 2004, Huffsmith disputed the allegations that ZakCo was responsible for certain alleged defects in the construction of the Hotel by way of a memo that was misdated April 30, 2003.

21.     Travelers alleges, based on information and belief, that in early 2007 Koehler and/or Casper Lodging hired experts to examine the hotel, which experts provided a report dated February 27, 2007 regarding alleged construction defects and alleged property damage at the Hotel (the "2007 Expert Report").

22.     Travelers alleges, based on information and belief, that a copy of the February 27, 2007 Expert Report was provided to Huffsmith and ZakCo in March 2007, along with Koehler's and/or Casper Lodging's demand that Akers repair the alleged construction defects. Travelers

alleges, based on information and belief, that Akers deflected such demands to Huffsmith and/or ZakCo.

23.     On information and belief, Koehler and/or Casper Lodging contacted Huffsmith, further to Akers's instructions, several times between 2004 and 2007, however, Koehler and/or Casper Lodging were unsatisfied with Huffsmith's responses.

24.     None of the defendants provided Travelers notice of, or a copy of, the February 27, 2007 Expert Report or of the demands of Koehler and/or Casper Lodging that were made between 2004 and 2007 at any relevant time.

25.     On information and belief, Travelers alleges that Akers's attorney tendered the matter to the insurance company that had insured ZakCo in 2004, however, coverage was denied. Travelers provided no coverage for ZakCo or Huffsmith in 2004.

26.     Neither ZakCo nor Huffsmith notified Travelers or disclosed the existence of the alleged defects or property damage, or of the demands of Koehler and/or Casper Lodging at any time before ZakCo and/or Huffsmith acquired the Policies from Travelers on October 8, 2007.

27.     Travelers alleges, based on information and belief, that the Defendants did not repair the alleged construction defects or alleged damages at the Hotel.

**B.     *Casper v. Akers* Litigation.**

28.     Casper Lodging filed in South Dakota the first lawsuit that constitutes the Underlying Litigation against Akers on October 9, 2009 (the "*Casper* Litigation").

29.     On October 14, 2009, Akers joined ZakCo to the *Casper* Litigation as a third party defendant. Huffsmith was served with the Third Party Complaint in the *Casper* Litigation on November 4, 2009. Ex. 1.

6

30.     Neither Huffsmith nor ZakCo provided Travelers with notice of the *Casper* Litigation, nor did either deliver to Travelers a copy of the pleadings in the *Casper* Litigation at any relevant time.

31.     On information and belief, after consultation with attorneys, Huffsmith and/or ZakCo determined not to tender the *Casper* Litigation to Travelers because they had concluded that the Travelers Policies did not provide coverage.

32.     As the President of ZakCo, Huffsmith filed an Answer to the Third Party Complaint in the *Casper* Litigation on November 24, 2009 on a *pro se* basis. Ex. 5. Among the affirmative defenses asserted, ZakCo objected to the jurisdiction of the South Dakota court and further objected that its agreement with Akers contained a mandatory arbitration clause. Huffsmith represented ZakCo without counsel.

33.     On information and belief, the South Dakota court had no personal jurisdiction over ZakCo because ZakCo did not conduct business there and had insufficient contacts with South Dakota to support jurisdiction.

34.     On information and belief, had the defense been properly preserved and asserted that the South Dakota court lacked jurisdiction, the *Casper* Litigation would have been dismissed as to ZakCo.

35.     On information and belief, ZakCo's contract with Akers contained a mandatory arbitration clause that required any disputes between them to be resolved by way of binding arbitration within a certain distance from the hotel, which meant that any such arbitration had to be filed in Wyoming.

36.     On information and belief, had the defense been properly preserved and asserted that the dispute had to be resolved by way of binding arbitration in Wyoming, the *Casper* Litigation would have been dismissed as to ZakCo.

37.     On information and belief, neither the defense based on the lack of jurisdiction nor the defense based on the mandatory arbitration clause were presented by way of a motion to dismiss in the *Casper* Litigation at any time before December 2013, whereupon the claim against ZakCo was severed and became dormant.

38.     The *Casper* Litigation proceeded with discovery (including document productions, depositions, and interrogatories). Huffsmith's deposition was taken in the *Casper* Litigation on March 8, 2010.

39.     Neither Huffsmith nor ZakCo gave Travelers the opportunity to participate in the *Casper* Litigation at any time before at least December 2013, when the case was severed and became dormant. Travelers was not provided an opportunity to defend the Huffsmith deposition nor to participate in or gain access to discovery in that litigation.

40.     Expert reports were exchanged among the parties to the *Casper* Litigation in or about 2012 to 2013. Koehler and/or Casper provided an expert report to the defendants, including, it is believed, ZakCo through Huffsmith, that was dated March 30, 2012.

41.     Akers disclosed his experts on May 22, 2012 and provided expert reports including one on August 14, 2013.

42.     Neither Huffsmith nor ZakCo obtained expert testimony or provided expert reports in compliance with the scheduling order in the *Casper* Litigation.

43.     Travelers alleges, based on information and belief, that copies of the March 30, 2012 Expert Report were provided to the Defendants in the *Casper* Litigation, including ZakCo

through Huffsmith; however, neither Huffsmith nor ZakCo provided Travelers with copies of those reports at any relevant time.

44.     Neither Huffsmith nor ZakCo provided Travelers an opportunity to select or recommend expert witnesses or expert discovery in the *Casper* Litigation at any relevant time.

45.     Neither Huffsmith nor ZakCo participated meaningfully in discovery or the defense of the *Casper* Litigation before at least December 2013, when the case was severed and became dormant.

46.     Neither Huffsmith nor ZakCo sought indemnity or contribution from the subcontractors, design professionals, or others in the *Casper* Litigation before at least December 2013, when the case was severed and became dormant.

47.     On May 23, 2012, Akers amended the Third Party Complaint in the *Casper* Litigation, naming many of the subcontractors who worked at the Hotel. By Stipulation dated July 10, 2012, Akers filed a Second Amended Third Party Complaint in the *Casper* Litigation.

48.     These pleadings were not provided to Travelers at any relevant time.

49.     Neither Huffsmith nor ZakCo took any efforts to seek contribution or indemnity from the subcontractors who Akers had added to the litigation.

50.     On November 20, 2013, Akers moved to bifurcate the Third Party Complaint against ZakCo in the *Casper* Litigation, which was to proceed at a later time. Akers supported the motion to bifurcate, in part, with the observation that, "ZakCo has failed to participate in this litigation."

51.     On information and belief, ZakCo's failure to participate was caused both by a bankruptcy filing by Huffsmith and the lack of jurisdiction over ZakCo in South Dakota.

52.     Travelers alleges, based on information and belief, that shortly before the jury trial commenced in the *Casper* Litigation in December 2013, Akers settled with and released the subcontractors that he had claimed were responsible for the alleged defects and alleged damage. Akers provided those subcontractors with very broad general releases.

53.     A jury trial was held in the *Casper* Litigation, excluding the Third Party Complaint against ZakCo, in December 2013, concluding with a jury verdict on December 20, 2013 against Akers for $1,019,468.74.

54.     Akers filed post-trial motions, which were denied resulting in the entry of judgment against Akers on February 14, 2014. To the verdict, the Court added prejudgment interest and costs, for a total judgment of $2,045,681. The Court indicated that post-judgment interest would accrue.

55.     Akers appealed the judgment.

56.     None of the Defendants provided Travelers with a copy of the complaint, summons, or judgment in the South Dakota Litigation before March 2014, which was after judgment had already entered.

57.     The South Dakota Supreme Court affirmed the judgment, remanding only for a recalculation of interest.

58.     Following remand, on February 8, 2016, the *Casper* Litigation trial court entered its Findings of Fact and Conclusions of law regarding the recalculated interest. The Court found that Akers and Casper Lodging had agreed that the sum of $1,833,229.08 would fully satisfy the judgment, including costs and interest. On February 10, 2016, Casper Lodging filed a Satisfaction of Judgment, showing full payment of the judgment.

59.     As mentioned above, Akers moved to bifurcate his third party complaint against ZakCo from the litigation just before trial. That motion to bifurcate the Third Party Complaint against ZakCo in the *Casper* Litigation was granted on December 5, 2013.

60.     Travelers alleges on information and belief that the bifurcated Third Party Complaint against ZakCo had been effectively dormant or stayed until approximately April 6, 2016, whereupon Akers filed a motion for summary judgment against ZakCo. That summary judgment motion was not provided to Travelers until approximately April 26, 2016.

61.     Travelers has agreed to defend the *Casper* Litigation under a complete reservation of rights, including without limitation the rights to file this declaratory action seeking a determination that Travelers owes ZakCo neither a defense nor indemnification. However, the defense of the action has been substantially prejudiced by the lack of prior notice.

**C.     The *Wyoming* Litigation.**

62.     Travelers alleges, based on information and belief, that on or about January 30, 2014, Akers filed a second lawsuit against ZakCo, this time naming also Huffsmith, and this time filing the lawsuit in Wyoming ("the Wyoming Litigation"), which is attached as Exhibit 2, seeking indemnification from the judgment that had been entered against Akers in the *Casper* Litigation.

63.     The *Casper* Litigation against ZakCo and the Wyoming Litigation against ZakCo and Huffsmith are in nearly all respects identical and are based on the same nucleus of operative facts, except that the *Casper* Litigation did not name Huffsmith.

64.     Travelers has agreed to defend the Wyoming Litigation under a complete reservation of rights, including without limitation the rights to file this declaratory action seeking

a determination that Travelers owes neither ZakCo nor Huffsmith either a defense or indemnity. However, the defense of the action has been substantially prejudiced by the lack of prior notice.

65.    On information and belief, Travelers alleges that Akers successfully sought to stay the Wyoming Litigation after it was filed and that that litigation remains stayed.

66.    These two lawsuits that Akers has brought against ZakCo and/or Huffsmith are together referred to as the "Underlying Litigation."

**C.    Tender of Claims under the Travelers' Policies.**

67.    Travelers learned of the *Casper* Litigation, claims, and alleged occurrence / property damage by way of a March 28, 2014 tender by Akers's wife to Akers's alleged insurer, which was Travelers. This March 28, 2014 notice of claim did not tender to Travelers as an alleged insurer of ZakCo or Huffsmith, but, rather, only tendered the complaint to Travelers as the alleged insurer of Akers.

68.    On September 23, 2014, Akers tendered the bifurcated Third Party Complaint in the *Casper* Litigation and/or the Wyoming Litigation (jointly referred to as the "Underlying Litigation") to ZakCo's insurance agent, apparently in order to attempt to secure coverage for ZakCo and/or Huffsmith under any policies that might have been applicable.

69.    ZakCo's insurance agent forwarded Akers's tender to Travelers and other insurers on or about September 30, 2014. This was the first tender of the Underlying Litigation or notice of the related construction defects or damage that Travelers received under the relevant policies from ZakCo or Huffsmith.

**D.    Repairs, Renovation, and Spoliation of Evidence.**

70.    Travelers alleges, based on information and belief, that Casper Lodging and/or Koehler caused the Hotel to be completely repaired and renovated in 2010 to 2011.

71.     Travelers alleges, based on information and belief, that as a result of the repairs and renovation of the Hotel in 2010 to 2011, all primary evidence regarding the alleged defects and alleged damages were destroyed and lost, such that it became impossible for defense experts to study the alleged defects or alleged damages first-hand in order to determine the existence of defects or the extent or causes of the damage.

72.     Travelers alleges, based on information and belief, that none of the defendants, nor their subcontractors, made any attempt to examine, investigate, or study the alleged defects and alleged damage at the Hotel before the Hotel was completely repaired and renovated in 2011.

73.     Travelers alleges, based on information and belief, that neither ZakCo nor Huffsmith ever hired experts to either investigate the loss, examine the alleged defects or alleged damage, or to review the 2007 and 2011 Expert Reports of Koehler and/or Casper Lodging.

74.     Travelers alleges, based on information and belief, that Akers hired experts who reviewed the 2007 and 2011 Expert Report of Koehler's and/or Casper Lodging's experts in connection with defending the *Casper* Litigation, but Akers's experts determined that they could not determine which subcontractors were responsible for which alleged defects or alleged damage at the Hotel, at least in part because of the 2011 repairs and renovations.

E.     **The Insurance Policies.**

75.     The Policies at issue cover certain damages that happen during the policy period of October 8, 2007 to October 8, 2009. The Policies are attached hereto as Exhibits 3 and 4 and the terms thereof are incorporated herein.

76.     The insuring agreement in the policies provide that:

    **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

Exs. 3 and 4 at CG 00 01 10 01 at p. 1 of 16.

    77.    The Policies further provide as follows:

    **b.**    This insurance applies to "bodily injury" and "property damage" only if:

    **(1)**    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"

    **(2)**    The "bodily injury" or "property damage" occurs during the policy period; and

    **(3)**    Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** -- Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

    **c.**    "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** -- Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

    **d.**    "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II -- Who Is An Insured or any

"employee" authorized by you to give or receive notice of an "occurrence" or claim:

    **(1)**    Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

    **(2)**    Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage;" or

    **(3)**    Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

*Id.*

78.    The policies contain the following potentially applicable exclusions:

**2.**    Exclusions

\* \* \*

**b.**    Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

    **(1)**    That the insured would have in the absence of the contract or agreement; or

    **(2)**    Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. . . .

\* \* \*

**j.**    Damage to Property

"Property damage" to:

\* \* \*

    **(5)**    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)**     That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

\* \* \*

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k.**     Damage to Your Product

"Property damage" to "your product" arising out of it or any part of it.

**l.**     Damage to Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.**     Damage to Impaired Property or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)**     A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)**     A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

Exs. 3, 4 at p. 2 of 16 and pp. 4-5 of 16.

79.     The products-completed operations hazard is defined as follows:

**16.**   "Products-completed operations hazard":

    **a.**   Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

        **(1)**   Products that are still in your physical possession; or

        **(2)**   Work that has not yet been completed or abandoned. . . .

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    **b.**   Does not include "bodily injury" or "property damage" arising out of:

        **(1)**   The transportation of property . . . .;

        **(2)**   The existence of tools, uninstalled equipment or abandoned or unused materials; or

        **(3)**   Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

Exs. 3, 4 at pp. 14-15 of 16 (emphasis added).

    80.   "Your product" is defined as:

    **21.**   "Your product":

        **a.**   Means:

            **(1)**   Any goods or products, **other than real property**, manufactured, sold, handled, distributed or disposed of by: . . . .

Exs. 3, 4  at p. 15 of 16 (emphasis added).

    81.   The policies are also subject to the following exclusionary endorsement:

EXCLUSION - CONSTRUCTION MANAGEMENT

ERRORS AND OMISSIONS

* * *

This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of:

1. The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications by any architect, engineer or surveyor performing services on a project on which you serve as construction manager;

2. Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager.

This exclusion does not apply to "bodily injury" or "property damage" due to construction or demolition work done by you, "your employees" or your subcontractors.

Exs. 3, 4 at CG D2 93 11 03.

82. The next relevant exclusionary endorsement reads:


EXCLUSION - CONTRACTORS - PROFESSIONAL LIABILITY

* * *

1. This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

   a. Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and

   b. Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.

2. Subject to Paragraph 3. below, professional services include:

    **a.**    Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

    **b.**    Supervisory or inspection activities performed as part of any related architectural or engineering activities.

**3.**    Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

Exs. 3, 4 at CG D3 07 11 03.

83.    Another relevant exclusionary endorsement reads:

EXCLUSION - ALL PROJECTS SUBJECT TO A WRAP-UP INSURANCE PROGRAM WITH LIMITED EXCEPTIONS FOR CERTAIN ONGOING OPERATIONS

\* \* \*

This insurance does not apply to . . . "property damage" arising out of any project that is or was subject to a "wrap-up insurance program".

This exclusion does not apply to . . . "property damage" arising out of your ongoing operations . . . .:

\* \* \*

**2.**    The following is added to **Section V — Definitions**:

"Wrap-up insurance program" means any agreement or arrangement, including any contractor-controlled, owner-controlled or similar insurance program, under which some or all of the contractors working on a specific project, or specific projects, are required to participate in a program to obtain insurance that:

    **a.**    Includes the same or similar insurance as that provided by this Coverage Part; and

    **b.**    Is issued specifically for injury or damage arising out of such project or projects.

Exs. 3, 4 at CG D3 91 03 07.

84.   Another exclusionary endorsement relates to exterior insulation and finish systems:

EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEM

\* \* \*

This insurance does not apply to . . . "property damage" . . . arising out of:

1.   The design, manufacture, construction, fabrication, distribution, sale, preparation, installation, application, maintenance or repair, including remodeling, service, correction or replacement of any "exterior insulation and finish system" (commonly referred to as synthetic stucco or EIFS) or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashing, coatings, caulking or sealants in connection with such a system; or

2.   "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on any part of that structure.

85.   The following is added to DEFINITIONS (Section V):

"Exterior insulation and finish system" means an exterior cladding or finish system used on any part of any structure and consisting of:

a.   A rigid or semi-rigid insulation board made of expanded polystyrene or other materials; and

b.   The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate; and

c.   A reinforced base coat; and

d.   A finish coat providing surface texture and color.

Exs. 3, 4 at CG D2 04 06 01.

86.     Many of the alleged construction defects and water damage relate to alleged defects in the application of the stucco and flashing systems and the failure to use an EIFS, as allegedly required by the specifications.

87.     The policy contains a blanket additional insured (contractors) endorsement. CG D2 46 08 05.

The conditions to coverage provide as follows:

SECTION IV — COMMERCIAL GENERAL LIABILITY CONDITIONS

* * *

2.      Duties In The Event Of Occurrence, Offense, Claim Or Suit

      a.      You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

            (1)     How, when and where the "occurrence" or offense took place;

            (2)     The names and addresses of any injured persons and witnesses; and

            (3)     The nature and location of any injury or damage arising out of the "occurrence" or offense.

      b.      If a claim is made or "suit" is brought against any insured, you must:

            (1)     Immediately record the specifics of the claim or "suit" and the date received; and

            (2)     Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

      c.      You and any other involved insured must:

    **(1)**    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

    **(2)**    Authorize us to obtain records and other information;

    **(3)**    Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

    **(4)**    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

    **d.**    No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

Exs. 3, 4 at pp. 10-11 of 16.

88.    The policy further provides as follows:

**B.**    Other Insurance and Subrogation.

The Conditions to Coverage further provide as follows:

**4.**    Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

    **a.**    Primary Insurance

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

    **b.**    Excess Insurance

This insurance is excess over:

\* \* \*

> **(2)**     Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.
>
> When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". . . .
>
> When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:
>
> * * *
>
> **c.**     Method Of Sharing
>
> If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. . . .

Exs. 3, 4 at pp. 10-11 of 16.

89.     The policy also has the following condition to coverage:

> **8.**     Transfer Of Rights Of Recovery Against Others To Us
>
> If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

Exs. 3, 4 at p. 12 of 16.

90.     Travelers has agreed to provide ZakCo and Huffsmith a defense under a full reservation of rights, including the rights to bring this declaratory action and to withdraw the defense.

**F.     Late Notice Caused Substantial Prejudice.**

91.     The fact that Travelers did not receive timely notice of the property damage, alleged occurrences, and claims at issue and immediate copies of the Third Party Complaint in the *Casper* Litigation or of the Wyoming Litigation complaint, caused substantial and material prejudice to Travelers, including without limitation the following:

a.      Travelers was unable to assess the risk that it was insuring because ZakCo and Huffsmith provided no notice or disclosure to Travelers of the claims at issue before Travelers issued the Policies. As a result, ZakCo and Huffsmith seek insurance coverage for something that was a known loss and a loss-in-progress (for the same reason, the loss also does not constitute "property damage" during the policy period).

b.      Travelers was denied the opportunity of adjusting the loss at any time from 2007 to 2011 (before the renovations and repairs took place) and / or paying for the repairs in lieu of litigation.

c.      Travelers was denied the opportunity of negotiating with Koehler or Casper at any time before the judgment was entered, after which judgment ZakCo and Huffsmith lost the leverage or uncertainty needed to negotiate or effectuate settlement.

d.      Travelers was denied the opportunity of negotiating with Akers. Akers settled with the subcontractors, who were actually responsible for the construction work. But the delayed notice meant that no settlement could be attempted with Akers on behalf of ZakCo or Huffsmith at or before the time that the subcontractors were able to settle.

e.      Travelers was denied the opportunity to sue, settle with, or seek indemnification or contribution from the subcontractors. First, the evidence needed to apportion the loss among the subcontractors or to determine which subcontractor was responsible for which alleged defect was lost due to the renovations, years before notice was provided to Travelers. Second, Akers's settlement with the subcontractors would make it more difficult, or perhaps impossible, for Travelers to seek payment from the subcontractors. Third, some of the subcontractors may be out of business or otherwise unable to settle, indemnify or hold harmless. And fourth, the statute of limitations, repose, or laches might bar any claim against the subcontractors by Travelers, ZakCo, or Huffsmith. Because of the late notice, Travelers's ability to bring contribution or indemnity claims against the subcontractors was substantially prejudiced.

f.      Travelers received no notice of the construction defects at issue until about ten years after the initial damage occurred in 2004, no notice of the claims made against ZakCo or Huffsmith for several years (from and after 2007), no notice of the underlying *Casper* Litigation for about five years, and no notice until after judgment entered against Akers. Travelers never had an opportunity to inspect the alleged construction defects before the hotel was fully repaired and renovated in 2011. As a result, the primary evidence is all long lost.

g.      Due to the late notice, at least one witness was lost, the memories of virtually all of the witnesses were lost or compromised, and documentation was lost, including the repair logs and any other evidence of the existence or extent of the alleged defects and damage.

h.      Travelers had no opportunity to provide a defense to the litigation; no opportunity to select defense counsel or experts; no opportunity to provide input relating to the experts, the investigation, the discovery, deposition questions or strategy, the jury instructions, the verdict form, or the trial. Due to the late notice, Travelers was not provided the opportunity to file a Motion to Dismiss for lack of jurisdiction or due to the mandatory arbitration clause. Travelers was also not provided an opportunity to file an answer, counterclaim, and/or third party claims. Travelers was therefore substantially prejudiced in its right to defend against the claims.

i.      A judgment of approximately $2 million was entered against Akers before Travelers received notice, as to which judgment Akers seeks indemnity from Huffsmith and ZakCo.

j.      Travelers lost the opportunity to determine whether any portion of the loss was outside of coverage.

k.      Travelers had no opportunity to determine or allocate the costs between those needed for repairing allegedly covered construction defects and those relating to renovations and improvements, and no opportunity to determine whether the contractor hired was appropriate for the job.

l.      Travelers was denied the opportunity of authenticating documents or taking other discovery.

## FIRST CAUSE OF ACTION

### (Declaratory Relief)

92.      Travelers incorporates herein verbatim Paragraphs 1 to 91 and Exhibits 3 and 4.

93.     Travelers contends that it does not owe ZakCo or Huffsmith either a duty to indemnify or defend in the Wyoming Litigation or the bifurcated *Casper* Litigation for at least the following reasons:

a.      There has been no covered occurrence during or after the date that the Policies issued.

b.      The continuing loss was expected and intended by ZakCo and Huffsmith.

c.      The loss was a loss-in-progress and a known risk as of the date that the Policies were issued and, therefore, does not constitute "property damage" during the Policy periods.

d.      ZakCo and/or Huffsmith provided Travelers with late notice, which caused Travelers substantial and material prejudice.

e.      The terms, conditions, and exclusions of the Policies apply or might apply to preclude coverage.

94.     Travelers alleges, based on information and belief, that Akers tendered the Wyoming Litigation and/or the *Casper* Litigation to Travelers, apparently in the belief that Travelers owes ZakCo and/or Huffsmith indemnity for those matters.

95.     Travelers alleges, based on information and belief, that ZakCo and/or Huffsmith, through their agent, tendered the Underlying Litigation to Travelers, contending that they are owed a defense or indemnity for the Wyoming Litigation or for the bifurcated *Casper* Litigation.

96.     Accordingly, there is a dispute in controversy between the Parties to this litigation as to whether Travelers owes any obligations to ZakCo or Huffsmith with regard to the Underlying Litigation and, if so, what obligations are owed.

97.     Travelers asks that this Court enter a declaratory judgment that Travelers does not owe either indemnity or a defense to Huffsmith or ZakCo with respect to the Underlying Litigation, the alleged defects or alleged damage to the Hotel, or the judgment that entered against Akers.

## SECOND CAUSE OF ACTION

### (Breach of Conditions and of Contract)

98.     Travelers incorporates herein verbatim Paragraphs 1 to 97 and Exhibits 3 and 4.

99.     Travelers alleges that it issued the Policies.

100.    Travelers alleges that the Policies required Huffsmith and ZakCo to provide timely notice to Travelers of any claims, property damage, suits, or summons; and to provide Travelers with a copy of any demands, complaints, summons, or other papers immediately.

101.    Travelers alleges that ZakCo and Huffsmith breached the conditions of the Policies by failing to timely provide Travelers notice of the relevant claims, property damage, suits, or summons; and by failing to immediately provide to Travelers a copy of the demands, complaints, summons, or other papers relating to the Hotel, the Wyoming Litigation, and the *Casper* Litigation.

102.    Travelers was substantially and materially prejudiced by the lack of notice for many reasons, including but not limited to the following: it was prevented from investigating or adjusting the alleged defects and damages; resolving the claims by means of making timely repairs before the alleged water infiltration allegedly resulted in severe property damage; settling the claims or the litigations timely; securing dismissal for lack of jurisdiction or further to the mandatory arbitration clause; defending the lawsuits and securing expert examinations and reports; securing evidence in the form of documentation, witness testimony, or expert testimony;

and subrogating, gathering necessary evidence, and bringing indemnity claims against the subcontractors responsible for the alleged defects and alleged property damage.

103.    As a result of the breached Policy terms and conditions, Travelers seeks a judgment that it does not owe Huffsmith or ZakCo either a defense or indemnity with respect to the Underlying Litigation, the alleged defects and alleged damage at the Hotel, or the judgment that was entered against Akers.

WHEREFORE, Plaintiffs pray that the Court:

1.    Enter a judgment in favor of Travelers holding that it has no duty to defend or to indemnify either Huffsmith or ZakCo with respect to the Underlying Litigation.

2.    Enter a judgment in favor of Travelers holding that it has no duty to defend or to indemnify any of Akers, Huffsmith, or ZakCo with respect to the claims, damages, property damage, repairs, renovations, judgment, or other costs and expenses relating in any way to the Hotel.

Dated: June 6 , 2016

Patrick T. Holscher
SCHWARTZ, BON, WALKER & STUDER, LLC
141 S. Center, Suite 500
Casper, WY 82604
(307) 235-6681 Telephone
(307) 234-5099 Facsimile
pat@schwartzbon.com